GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:     CHRISTOPHER CONNOLLY
         JENNIFER C. SIMON
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2761/2746
E-mail: christopher.connolly@usdoj.gov
         jennifer.simon@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>CHESTNUT PETROLEUM DIST., INC., CPD ENERGY CORP., CPD NY ENERGY CORP, CHESTNUT MART OF GARDINER, INC., CHESTNUT MARTS, INC., GREENBURGH FOOD MART, INC., MIDDLETOWN FOOD MART, INC., and NJ ENERGY CORP,<br><br>        Defendants. | 19 Civ. 3904<br><br>**<u>COMPLAINT</u>** |

The United States of America, by and through its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, acting on behalf of the United States Environmental Protection Agency ("EPA"), alleges for its complaint against defendants Chestnut Petroleum Dist., Inc. ("Chestnut"), CPD Energy Corp. ("CPD Energy"), CPD NY Energy Corp ("CPD NY"), Chestnut Mart of Gardiner, Inc. ("Chestnut Mart of Gardiner"), Chestnut Marts, Inc. ("Chestnut Marts"), Greenburgh Food Mart, Inc. ("Greenburgh Food Mart"), Middletown Food Mart, Inc. ("Middletown Food Mart"), and NJ Energy Corp ("NJ Energy") (collectively, "Defendants"), as follows:

## INTRODUCTION

1.     Service stations typically store gasoline in underground storage tanks ("USTs"). When operated conscientiously and monitored closely, USTs are a safe and effective means to store gasoline.  But when USTs are not subjected to basic operational safeguards, they can endanger the public and the environment, for example by leaking petroleum into the water supply, discharging toxic vapors into the air, or even triggering fires or explosions.

2.     Recognizing the harms that may arise from USTs and the need to guard against those harms through careful regulation, in 1984 Congress passed Subtitle I of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6691-6991m.  Subtitle I and its related regulations establish parameters for the regulation of USTs and place maintenance, monitoring, and reporting obligations on the owners and operators of USTs in order to ensure that those USTs are operating safely.

3.     Defendants repeatedly violated regulations designed to protect the health and safety of the public and the environment at twenty locations (the "Facilities") within the Southern District of New York and adjoining districts where Defendants either own USTs, operate them, or both.

4.     In particular, at twenty separate Facilities, Defendants violated Subtitle I of RCRA and its related regulations by one or more of the following: (i) failing to perform release (*i.e.*, leak or spill) detection; (ii) failing to maintain and provide records of release detection monitoring; (iii) failing to operate corrosion protection systems (including inspecting and testing) and failing to maintain and provide records of corrosion protection monitoring; (iv) failing to cap and secure USTs that were temporarily closed; (v) failing to perform release detection for USTs that were temporarily closed; (vi) failing to report suspected releases or unusual operating conditions for USTs; (vii) failing to conduct release investigations and failing to confirm suspected releases or

unusual operating conditions; and (vii) failing to establish "financial responsibility"—*i.e.*, failing to maintain the required insurance policies sufficient to take corrective action and compensate third parties for bodily injury and property damage caused by accidental releases arising from the operation of their USTs.

5.     The United States brings this action pursuant to Section 9006(a)(1) of RCRA, 42 U.S.C. § 6991e(a)(1), for an order enjoining Defendants to comply with the relevant statutory and regulatory requirements for USTs and to perform any necessary remedial actions that may be necessary in light of their past violations.   The United States also seeks civil penalties from Defendants pursuant to Section 9006(d)(2) of RCRA, 42 U.S.C. § 6991e(d)(2).

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 9006(a)(1) of RCRA, 42 U.S.C. § 6991e(a)(1).

7.     Venue is proper in the Southern District of New York pursuant to 42 U.S.C. § 6991e(a)(1) insofar as the violations occurred within this District.   To the extent certain violations occurred outside of this District, such violations are properly asserted in this proceeding under the pendent venue doctrine.

## THE PARTIES

8.     Plaintiff is the United States of America on behalf of EPA.

9.     Defendant Chestnut is a New York corporation located at 536 Main Street, New Paltz, New York.  At all times relevant to the allegations herein, Defendant Chestnut was the owner and/or operator of USTs at Facilities 4, 5, 6, 8 and 9, described below.  Defendant Chestnut, or its subsidiaries or affiliates, was also the owner and/or operator of the USTs located at Facilities 15, 16, 17, 18, 19, and/or 20, at all times relevant to the allegations herein.

- 3 -

10.     Defendant Chestnut Mart of Gardiner is a New York corporation located at 536 Main Street, New Paltz, New York.  At all times relevant to the allegations herein, Defendant Chestnut Mart of Gardiner was the owner of USTs at Facility 8, described below.

11.     Defendant Chestnut Marts is a New York corporation located at 536 Main Street, New Paltz, New York.  At all times relevant to the allegations herein, Defendant Chestnut Marts was the operator of USTs at Facility 4, described below.

12.     Defendant CPD Energy is a New York corporation located at 536 Main Street, New Paltz, New York.  At all times relevant to the allegations herein, Defendant CPD Energy was the owner and/or operator of USTs at Facilities 6, 7 and 8, described below.  Defendant CPD Energy, or its subsidiaries or affiliates, was also the owner and/or operator of the USTs located at Facilities 15, 16, 17, 18, 19, and/or 20, at all times relevant to the allegations herein.

13.     Defendant CPD NY is a New York corporation located at 536 Main Street, New Paltz, New York.  At all times relevant to the allegations herein, Defendant CPD NY was the owner and/or operator of USTs at Facilities 1, 2, and 3, described below.  Defendant CPD Energy, or its subsidiaries or affiliates, was also the owner and/or operator of the USTs located at Facilities 15, 16, 17, 18, 19, and/or 20, at all times relevant to the allegations herein.

14.     Defendant Greenburgh Food Mart is a New York corporation located at 536 Main Street, New Paltz, New York.  At all times relevant to the allegations herein, Defendant Greenburgh Food Mart was the owner of USTs at Facility 6, described below.

15.     Defendant Middletown Food Mart is a New York corporation located at 536 Main Street, New Paltz, New York.  At all times relevant to the allegations herein, Defendant Middletown Food Mart was the operator of USTs at Facility 7, described below.

16.     Defendant NJ Energy Corp. is a New York corporation located at 536 Main Street, New Paltz, New York.  At all times relevant to the allegations herein, Defendant NJ Energy Corp. was the owner and/or operator of USTs at Facilities 10, 11, 12, 13, and 14 described below.

## STATUTORY AND REGULATORY BACKGROUND

17.     Petroleum products such as gasoline contain volatile and semi-volatile compounds that pose substantial threats to human health.  For example, benzene is a known carcinogen; can cause drowsiness, dizziness, headaches, and unconsciousness when inhaled; and can have severe adverse effects on the central nervous system, including death, when ingested.  *See* EPA, Hazard Summary: Benzene, https://www.epa.gov/sites/production/files/2016-09/documents/benzene.pdf (last visited Sept. 6, 2018).  Similarly, inhalation of ethyl benzene may result in respiratory problems, such as chest constriction, as well as neurological problems, such as dizziness, while long-term exposure has the potential to damage the liver, kidneys, eyes, and central nervous system.  *Id.*  The central nervous system is also adversely affected by exposure to toluene: short-term exposure to even low levels of toluene may cause fatigue, sleepiness, headaches, and nausea, while chronic exposure has the potential to cause spasms, tremors, and impairment of basic functions such as speech, hearing, vision, memory, and coordination.  *See* EPA, Hazard Summary: Toluene, https://www.epa.gov/sites/production/files/2016-09/documents/toluene.pdf (last visited Sept. 8, 2018).

18.     Given these health risks, preventing spills and leaks from USTs that are used to store petroleum products is of the utmost importance.  This is particularly true given that petroleum products can move rapidly through the ground and into groundwater, and when they enter the water supply, they can cause the significant short-term and long-term health effects described above.  Even a small gasoline leak of one drop per second from a UST can, over the course of one

year, result in the release of about 400 gallons of gasoline into the nearby groundwater.  *See* EPA,

Source Water Protection Practices Bulletin: Managing Underground Storage Tanks to Prevent

Contamination of Drinking Water (July 2001).  Moreover, petroleum vapors may intrude into

nearby basements, sumps, and other underground structures, and can be hazardous when inhaled.

Finally, both petroleum products themselves, and the vapors they release, represent fire and

explosion hazards when they are not properly contained and monitored.

19.    In 1984, in order to regulate and monitor the use of USTs, Congress enacted

Subtitle I of RCRA, 42 U.S.C. §§ 6691-6991m.  Subtitle I defines a UST as "any one or

combination of tanks (including underground pipes connected thereto) which is used to contain an

accumulation of regulated substances, and the volume of which (including the volume of the

underground pipes connected thereto) is 10 per centum or more beneath the surface of the ground."

42 U.S.C. § 6991(1).  Petroleum is a "regulated substance."  42 U.S.C. § 6991(2)(B).

20.    Subtitle I directs the Administrator of EPA to promulgate regulations that place

certain obligations on the owners and operators of USTs.  An "owner" is defined as "any person

who owns an underground storage tank used for the storage, use, or dispensing of regulated

substances."  42 U.S.C. § 6991(4).  An "operator" is defined as "any person in control of, or having

responsibility for, the daily operation of the underground storage tank."  42 U.S.C. § 6991(3).

21.    Among other things, Subtitle I directs the Administrator of EPA to promulgate

regulations establishing:

> a. "requirements for maintaining a leak detection system, an inventory control
>
> system together with tank testing, or a comparable system or method designed
>
> to identify releases in a manner consistent with the protection of human health
>
> and the environment," 42 U.S.C. § 6991b(c)(1);

b.  "requirements for maintaining records of any monitoring or leak detection system or inventory control system or tank testing or comparable system," 42 U.S.C. § 6991b(c)(2);

c.  "requirements for the closure of tanks to prevent future releases of regulated substances into the environment," 42 U.S.C. § 6991b(c)(5); and

d.  "performance standards for underground storage tanks brought into use on or after the effective date of such standards," 42 U.S.C. § 6991b(e).

22.   Pursuant to Subtitle I, the Administrator of EPA has promulgated regulations that are codified at 40 C.F.R. Part 280.  These regulations establish requirements for owners and operators of USTs concerning, among other things:

a.  methods of release detection for tanks and pressurized piping, *see* 40 C.F.R. §§ 280.40-280.45;

b.  maintenance of records regarding compliance with release detection requirements, *see* 40 C.F.R. §§ 280.34(b)(4), (c) and 280.45(a)-(c);

c.  operation and maintenance of corrosion protection systems for steel UST systems, *see* 40 C.F.R. § 280.31(a)-(c), and maintenance of records regarding compliance with corrosion protection requirements, *see* 40 C.F.R. § 280.31(d)(1) & (2);

d.  operation, monitoring, capping and securing, and reporting for USTs that are either temporarily out of service or permanently closed, *see* 40 C.F.R. §§ 280.70-280.74;

e. reporting, investigation, and confirmation of suspected releases of regulated substances, and reporting of unusual operating conditions, *see* 40 C.F.R. §§ 280.50-280.53;

f. performance standards for UST systems installed after December 22, 1998 (*i.e.*, "new" UST systems), *see* 40 C.F.R. § 280.20; and

g. upgrade requirements for UST systems installed prior to December 22, 1998 (*i.e.*, "existing" UST systems), *see* 40 C.F.R. § 280.21.

23.     Subtitle I and its related regulations also establish "financial responsibility" requirements that direct owners and operators to maintain "insurance, guarantee, surety bond, letter of credit, qualification as a self-insurer or any other method satisfactory to the Administrator," 42 U.S.C. § 6991b(d), for the purpose of "taking corrective action and for compensating third parties for bodily injury and property damage caused by accidental releases arising from the operation of" their USTs, 40 C.F.R. § 280.93(a).  Owners and operators of USTs that are located at petroleum marketing facilities (such as service stations), or that handle an average of more than 10,000 gallons of petroleum per month, must maintain insurance of at least $1 million.  42 C.F.R. § 280.93(a)(1).  Moreover, owners and operators of 1 to 100 USTs must maintain insurance of at least $1 million, 40 C.F.R. § 280.93(b)(1), and owners and operators of 101 or more USTs must maintain insurance of at least $2 million, 40 C.F.R. § 280.93(b)(2).

24.     Subtitle I requires owners and operators of USTs to "furnish information relating to such tanks, their associated equipment, [or] their contents" to "any officer, employee or representative of the [EPA]" for, among other purposes, "taking any corrective action" or "enforcing the provisions" of Subtitle I.  42 U.S.C. § 6991d(a).  Moreover, owners and operators must, "at all reasonable times," permit EPA officers "to have access to, and to copy all records

relating to such tanks and permit such officer to have access for corrective action."  *Id.*  EPA officers are further authorized to physically access locations where USTs are located; inspect and obtain samples of the regulated substances stored in the USTs; monitor and test both the USTs and the "associated equipment, contents, or surrounding soils, air, surface water or ground water"; and "take corrective action."  42 U.S.C. § 6991d(a)(1)-(4).

25.    Where the Administrator of EPA determines that a person has violated any of the requirements of Subtitle I, he "may commence a civil action in the United States district court in which the violation occurred for appropriate relief, including a temporary or permanent injunction."  42 U.S.C. § 6991e(a)(1).

26.    Additionally, Subtitle I subjects owners or operators who, among other things, "fail[] to comply with . . . any requirement or standard promulgated by the Administrator under section 6991b of this title" to a civil penalty of up to $16,000 for each tank for each day of violation for violations occurring after January 12, 2009, through November 2, 2015.  42 U.S.C. § 6991e(d)(2);  40 C.F.R. Part 19.  For violations that occur after November 2, 2015, and where penalties are assessed on or after January 15, 2018, the statutory maximum civil penalty is increased to $23,426.  *See* 83 Fed. Reg. 1190, 1193 (Jan. 10, 2018); 40 C.F.R. § 19.4.

### DEFENDANTS' VIOLATIONS OF SUBTITLE I OF RCRA AND RELATED REGULATIONS

27.    Between June 2012 and March 2013, EPA inspectors conducted various on-site inspections of USTs owned and operated by the Defendants.  In addition, between April 2012 and June 2014, EPA sent five Information Response Letters ("Information Requests") to Defendants requesting additional information concerning the USTs at the Facilities, and Defendants responded to each of those Information Requests.  EPA also reviewed New York State Department of Environmental Conservation ("NYSDEC") Petroleum Bulk Storage ("PBS") registration

certificates for each of the Facilities.  Based on its on-site inspections, review of Defendants'
responses to the IRLs, and review of the NYSDEC PBS registration certificates, EPA has
identified numerous violations of Subtitle I of RCRA and its related regulations at each of the
Facilities.

28.     Collectively, Defendants own and/or operate USTs at more than 100 locations in
the Southern District of New York and neighboring districts, including the twenty Facilities
discussed below.

29.     Defendants, along with certain subsidiaries and affiliates, including but not limited
to Gunks Holding Corp. and NECG Holding Corp., are alter egos of one another.  For example,
they share the same corporate headquarters, are staffed by the same personnel (including corporate
executives and personnel who are tasked with regulatory compliance), and have responded on one
another's behalf to written inquiries from EPA concerning the twenty Facilities discussed below.

30.     Consistent with their status as alter egos, Defendants and these subsidiaries and
affiliates engaged in similar patterns of non-compliance with Subtitle I of RCRA and its related
regulations.  For example, they acquired several of the Facilities in January 2011 and April 2012,
but failed to promptly ensure compliance with their federal statutory and regulatory UST
obligations following these acquisitions.  The similarities in the nature and timing of the violations
stems from the fact that all of the Facilities discussed below, regardless of the entities identified as
their nominal owners or operators, exist within the same corporate structure and are overseen by
the same personnel, who failed to ensure statutory and regulatory compliance in the same ways.

31.     Accordingly, each Defendant is responsible for the violations of the other
Defendants identified therein, and is responsible for the violations of any affiliates or subsidiaries
similarly acting as alter egos.

32.     As detailed below, Defendants violated Subtitle I of RCRA and its related regulations at each of the Facilities by one or more of the following: (i) failing to perform release (*i.e.*, leak or spill) detection; (ii) failing to maintain and provide records of release detection monitoring; (iii) failing to operate corrosion protection systems (including inspecting and testing) and failing to maintain and provide records of corrosion protection monitoring; (iv) failing to cap and secure USTs that were temporarily closed; (v) failing to perform release detection for USTs that were temporarily closed; (vi) failing to report suspected releases or unusual operating conditions for USTs; (vii) failing to conduct release investigations and failing to confirm suspected releases or unusual operating conditions; and (vii) failing to establish "financial responsibility"— *i.e.*, failing to maintain the required insurance policies sufficient to take corrective action and compensate third parties for bodily injury and property damage caused by accidental releases arising from the operation of their USTs.

**Facility 1**

33.     "Facility 1" is a Mobil service station located at 1663 Route 9, Wappinger's Falls, New York.  Defendant CPD NY was the owner and operator of the USTs located at Facility 1 at all times relevant to the allegations herein.

34.     CPD NY acquired the Facility and USTs on January 13, 2011.  As of the date of the EPA inspection on March 7, one of the USTs at this location, Tank 500, is a waste oil tank that CPD NY had not used since acquiring Facility 1.

35.     During an EPA inspection on March 7, 2013, an EPA inspector confirmed that Tank 500 was temporarily closed (*i.e.*, not in use), but that it nonetheless contained more than eight inches of waste oil.  Moreover, release detection was not being performed for Tank 500.  An EPA inspector requested release detection records for Tank 500 for the twelve-month period prior to

the inspection, but the CPD NY representative present during the inspection did not provide such records, nor did CPD NY provide such records in response to EPA's Information Requests.

36.     From January 13, 2011, through March 7, 2013, CPD NY failed to perform release detection for Tank 500, a temporarily closed waste oil tank.

**Facility 2**

37.     "Facility 2" is a Mobil service station located at 290 Route 211 East, Middletown, New York.  Defendant CPD NY has been the owner of the USTs located at Facility 2, and Defendant CPD Energy was the operator of the USTs located at Facility 2 at all times relevant to the allegations herein.

38.     From January 13, 2011 (the date CPD NY acquired ownership of the USTs at this Facility), through December 16, 2012, CPD NY and CPD Energy failed to perform release detection monitoring for Tanks 1, 2, and 3.  Specifically, an inspection on August 28, 2012, showed that the automated tank gauging console lacked a Continuous Statistical Leak Detection (CSLD) chip that would have allowed it to perform release detection.  In response to EPA's Information Requests, Defendants did not provide evidence that release detection monitoring for Tanks 1, 2, or 3 was performed until December 16, 2012.

39.     During an inspection on August 28, 2012, an EPA inspector requested release detection records for the twelve-month period prior to the inspection for a waste oil tank at the Facility, Tank 6.  The Chestnut representative present during the inspection provided such records for only three of the prior 12 months.  No release detection records were provided for Tank 6 for September 2011, or for December 2011 through July 2012.  CPD Energy's response to EPA's Information Request acknowledged that it could not provide release detection records for these time periods.

40.     From September 1, 2011, through September 30, 2011, and from December 1, 2011, through July 31, 2012, CPD NY and CPD Energy failed to maintain release detection records for Tank 6.

**Facility 3**

41.     "Facility 3" is a Mobil service station located at 407 White Plains Road, Eastchester, New York.  Defendant CPD NY was the owner of the USTs located at Facility 5 at all times relevant to the allegations herein.

42.     During an inspection on February 11, 2013, an EPA inspector requested release detection records for the twelve-month period prior to the inspection.  Defendant CPD NY failed to provide release detection records for two USTs at Facility 3, Tanks 300 and 400, for the months of April 2012 through October 2012.  CPD NY also failed to provide release detection records for those USTs during that time period in response to EPA's Information Requests.

43.     From April 1, 2012, through October 31, 2012, CPD NY failed to maintain release detection records for Tanks 300 and 400.

**Facility 4**

44.     "Facility 4" is a Mobil service station located at 891 Saw Mill River Road, Ardsley, New York.  Defendants Chestnut and Chestnut Marts were the operators of the USTs located at Facility 4 at all times relevant to the allegations herein.

45.     During an inspection on September 6, 2012, an EPA inspector reviewed release detection records and a copy of Chestnut's contractor's annual compliance inspection report. These records indicated that the interstitial sensor in Tank 4 was in "alarm mode," meaning that there was a potential leak, beginning as early as July 30, 2011.  However, defendants Chestnut and Chestnut Marts did not report this potential leak within twenty-four hours, and also did not

investigate the potential leak within seven days.  Release detection records subsequently provided by defendant CPD in response to EPA's Information Requests further reflected that the sensor was in alarm mode on various dates between December 2011 and February 2012.

46.     On February 20, 2012, Chestnut's contractor notified the Westchester County Department of Health of an unusual operating condition and suspected release from Tank 4.  On February 27, 2012, Chestnut's contractor tested Tank 4 and determined that diesel fuel had leaked into the "interstitial space," *i.e.*, the space between the inner and outer walls of the tank.  The contractor removed the diesel fuel stored in Tank 4 and temporarily closed the tank.  The tank was ultimately repaired in November 2012.

47.     From August 1, 2011 (the date that the interstitial sensor was first in alarm mode) through February 20, 2012 (the date the alarm condition of Tank 4 was reported), Chestnut and Chestnut Marts failed to perform adequate release detection for Tank 4.

48.     From August 1, 2011, through February 20, 2012, Chestnut and Chestnut Marts failed to report a suspected release or unusual operating condition for Tank 4.

49.     From August 7, 2011 through February 27, 2012, Chestnut and Chestnut Marts failed to immediately investigate and confirm all suspected releases within 7 days.

**Facility 5**

50.     "Facility 5" is a Chestnut Marts service station located at 170 Saw Mill River Road, Mount Pleasant, New York.  Defendant Chestnut was the owner and operator of the USTs located at Facility 5 at all times relevant to the allegations herein.

51.     During an inspection on September 6, 2012, an EPA inspector observed that this Facility (which was not operational at the time) lacked power, and therefore was incapable of meeting either release detection or corrosion protection requirements.

52.     Two of the USTs at Facility 5, Tank 3 (for waste oil) and Tank 7 (for diesel fuel), were constructed of bare steel.   These tanks had been closed by the Westchester County Department of Health on February 27, 2007.   On the date of the EPA inspection, however, Tank 7 contained more than one inch of diesel fuel.   Moreover, Tank 7's lines, pumps, manways, and other ancillary equipment were not capped and secured.

53.     On October 11, 2012, Chestnut's contractor pumped out Tank 7.   On November 7, 2013, both Tank 3 and Tank 7 were removed from the Facility.

54.     From September 7, 2011, through October 11, 2012, Chestnut failed to provide release detection for Tank 7, a temporarily closed tank.

55.     From September 7, 2011, through November 7, 2013, Chestnut failed both to cap and secure Tank 7.

56.     From September 6, 2012, through November 7, 2013, Chestnut failed to operate (including inspecting and testing) and maintain corrosion protection for Tanks 3 and 7.

**Facility 6**

57.     "Facility 6" is a Shell service station located at 425 Dobbs Ferry Road, Greenburgh, New York.  Defendants Chestnut and Greenburgh Food Mart were the owners of the USTs located at Facility 6, and defendant CPD Energy was the operator of the USTs located at Facility 6 at all times relevant to the allegations herein.

58.     During an inspection on February 6, 2013, an EPA inspector requested release detection records for the twelve-month period prior to the inspection for each of the four USTs at the Facility.  No such records were provided for any of the USTs—Tanks 1, 2, 3, and 4—for February 2012.  In addition, no release detection records were provided for March 2012 for Tanks

1 and 2.  CPD Energy also failed to provide release detection records for those USTs during those time periods in response to EPA's Information Requests.

59.     From February 1, 2012, through February 28, 2012, Chestnut, Greenburgh Food Mart, and CPD Energy failed to maintain release detection records for Tanks 1, 2, 3, and 4.

60.     From March 1, 2012, through March 31, 2012, Chestnut, Greenburgh Food Mart, and CPD Energy failed to maintain release detection records for Tanks 1 and 2.

**<u>Facility 7</u>**

61.     "Facility 7" is a Middletown Food Mart located at 176 West Main Street, Middletown, New York.  Defendant CPD Energy was the owner of the USTs located at Facility 7, and defendant Middletown was the operator of the USTs located at Facility 7 at all times relevant to the allegations herein.

62.     During an inspection on August 28, 2012, EPA inspector reviewed release detection records which indicated that the interstitial sensor in Tank 1 was in alarm mode as of December 19, 2011.  The alarm was neither reported within twenty-four hours nor investigated within seven days.  On August 9, 2012, CPD's contractor repaired the sensor.

63.     From December 20, 2011 (*i.e.*, within twenty-four hours of the sensor going into alarm mode), through August 9, 2012, CPD Energy and Middletown failed to report Tank 1's suspected releases or unusual operating condition to EPA.

64.     From December 26, 2011 (i.e., within seven days of the sensor going into alarm mode), through August 9, 2012, CPD Energy and Middletown failed to conduct release investigation and confirmation of Tank 1's suspected release or unusual operating condition.

**Facility 8**

65.     "Facility 8" is a Chestnut Mart of Gardiner service station located at 604 Route 208, Gardiner, New York.  Defendants Chestnut and Chestnut Mart of Gardiner were the owners, and defendants Chestnut and CPD Energy were the operators, of the USTs located at Facility 8 at all times relevant to the allegations herein.

66.     During an inspection on August 8, 2012, an EPA inspector requested release detection records for the twelve-month period prior to the inspection for each of the three USTs at the Facility.  No such records were provided for any of the USTs for the months of March 2012 and May 2012.  Defendant CPD also failed to provide release detection records for those USTs during those months in response to EPA's Information Requests.

67.     From at least March 13, 2012, through May 31, 2012, Chestnut, Chestnut Mart of Gardiner, and CPD Energy failed to maintain release detection records for Tanks 1, 2, and 3.

**Facility 9**

68.     "Facility 9" is a Shell/Chestnut Petroleum service station located at 75 Dutch Hill Road, Orangeburg, New York.  Defendant Chestnut was the owner and operator of the USTs located at Facility 9 at all times relevant to the allegations herein.

69.     During the inspection on March 13, 2013, an EPA inspector requested release detection records for the twelve-month period prior to the inspection for the pressurized piping associated with the USTs at the Facility.  No such records were provided for the pressurized piping for March 13, 2012 through May 31, 2012.  Defendant CPD also failed to provide release detection records for the pressurized piping during that time period in response to EPA's Information Requests.

70.     Further, an EPA inspector observed that the USTs at Facility 9 were temporarily closed.  Although a representative from CPD NY present during the inspection stated that the USTs were temporarily closed in August 2012, CPD's records reflect that the USTs were temporarily closed in June 2012.  Under either scenario, however, the USTs' tank fill ports were not secured within 90 days of their temporary closure, *i.e.*, no later than October 1, 2012.

71.     From at least October 1, 2012 through March 13, 2013, Chestnut failed to cap and secure Tanks 001, 0002A, and 0002B.

**Facility 10**

72.     "Facility 10" is an Exxon service station located at 19 East 33rd Street, Paterson, New Jersey.  Defendant NJ Energy was the owner of the USTs located at Facility 10 at all times relevant to the allegations herein.

73.     During an inspection on October 5, 2012, an EPA inspector requested release detection records for the twelve-month period prior to the inspection for the two USTs at the Facility, Tanks E5 and E6.  No such records were provided for either of the USTs for October 2011 through June 2012.  Defendant NJ Energy also failed to provide release detection records for those USTs during those time periods in response to EPA's Information Requests.

74.     From April 5, 2012 (the date that NJ Energy acquired the USTs at Facility 10), through June 30, 2012, NJ Energy failed to maintain release detection records for Tanks E5 and E6.

**Facility 11**

75.     "Facility 11" is an Exxon service station located at 1400 Route 9 South, Old Bridge, New Jersey.  Defendant NJ Energy was the owner and operator of the USTs located at Facility 11 at all times relevant to the allegations herein.

76.     During an inspection on October 10, 2012, an EPA inspector requested release detection records for the twelve-month period prior to the inspection for each of the four USTs at the Facility, Tanks E1, E2, E3, and E4.  No such records were provided for any of the USTs for October 2011 through September 2012.  Defendant NJ Energy also failed to provide release detection records for those USTs during those time periods in response to EPA's Information Requests.

77.     From April 5, 2012 (the date that NJ Energy acquired the USTs at Facility 11), through September 30, 2012, NJ Energy failed to maintain release detection records for Tanks E1, E2, E3, and E4.

**Facility 12**

78.     "Facility 12" is an Exxon service station located at 9 St. George Avenue West, Linden, New Jersey.  Defendant NJ Energy has been the owner and operator of the USTs located at Facility 12 at all times relevant to the allegations herein.

79.     The three USTs at this Facility were temporarily closed at the time NJ Energy acquired the facility on June 19, 2012, and remained closed at the time of the EPA's inspection of the Facility on October 3, 2012.  Despite being temporarily closed, all three USTs at this facility still contained significant amounts of petroleum, and release detection monitoring was not being performed.  Leak detection tests on the USTs at this Facility did not recommence until November 1, 2012.

80.     From June 19, 2012, through November 1, 2012, NJ Energy failed to conduct release detection for temporarily closed tanks, E1, E2 and E3.

**Facility 13**

81.     "Facility 13" is an Exxon service station located at 468 Route 17N, Hasbrouck Heights, New Jersey.  Defendant NJ Energy was the owner and operator of the USTs located at Facility 13 at all times relevant to the allegations herein.

82.     The three USTs at this Facility, Tanks E1, E2, and E3, were temporarily closed at the time NJ Energy acquired the facility in April 2012, and remained closed at the time of the EPA's inspection of the Facility on October 8, 2012.  Despite being temporarily closed, Tank E1 contained more than one inch of petroleum, and therefore release detection was required for that tank.  However, release detection monitoring was not being performed.  Defendants did not provide any information in response to EPA's Information Requests establishing that Tank E1 was pumped clean of petroleum at any time following EPA's October 2012 inspection.

83.     During EPA's October 8, 2012, inspection, EPA also requested release detection records for the twelve-month period prior to the inspection for each of the three USTs at Facility 13, but no such records were provided to EPA, and CPD Energy's representative acknowledged that release detection was not being performed during the requested time period.

84.     In its February 26, 2014, response to EPA's January 30, 2014, Information Request, CPD Energy acknowledged that the tanks at Facility 13 were temporarily closed on September 9, 2010 and stated that the tanks did not return to service until July 2013.

85.     In its February 26, 2014, response to EPA's January 30, 2014, Information Request, NJ Energy also failed to provide any evidence that release detection was provided for the temporarily closed tank (Tank E1) for the period April 5, 2012, through July 2013, when Tank E1 was brought back into service.

**Facility 14**

86.     "Facility 14" is an Exxon service station located at 470 Route 1 North, Edison, New Jersey.  Defendant NJ Energy was the owner and operator of the USTs located at Facility 14 at all times relevant to the allegations herein.

87.     During an inspection on October 3, 2012, an EPA inspector requested release detection records for the twelve-month period prior to the inspection for each of the three USTs at the Facility, but no such records were provided.  Defendant NJ Energy's subsequent responses on January 10, 2013, and February 25, 2014, to EPA's Information Requests, failed to provide such records for Tanks E001, E002 and E003 for May 2012; and failed to provide such records for Tanks E001 and E003 for the period from July 1, 2012, through August 31, 2012.

**Facility 15**

88.     "Facility 15" is a Mobil service station located at 6885 Rt. 9, Rhinebeck, New York. Defendants, or their subsidiaries or affiliates, were the owners and operators of the USTs located at Facility 15 at all times relevant to the allegations herein.

89.     From April 1, 2013 to March 13, 2014, Defendants failed to maintain insurance coverage sufficient to take corrective action and to compensate third parties for bodily injury and property damage caused by accidental releases arising from the operation of the USTs located at Facility 15, in violation of RCRA's financial responsibility provisions.

**Facility 16**

90.     "Facility 16" is a Getty service station located at 1372 Union Street, Schenectady, New York.  Defendants, or their subsidiaries or affiliates, were the owners and operators of the USTs located at Facility 16 at all times relevant to the allegations herein.

91.     From May 1, 2012, to March 13, 2014, Defendants failed to maintain insurance coverage sufficient to take corrective action and to compensate third parties for bodily injury and property damage caused by accidental releases arising from the operation of the USTs located at Facility 16, in violation of RCRA's financial responsibility provisions.

**<u>Facility 17</u>**

92.      "Facility 17" is a Shell service station located at 3083 Webster Ave, Bronx, New York.  Defendants, or their subsidiaries or affiliates, were the owners and operators of the USTs located at Facility 17 at all times relevant to the allegations herein.

93.     From May 1, 2012, to March 13, 2014, Defendants failed to maintain insurance coverage sufficient to take corrective action and to compensate third parties for bodily injury and property damage caused by accidental releases arising from the operation of the USTs located at Facility 17, in violation of RCRA's financial responsibility provisions.

**<u>Facility 18</u>**

94.     "Facility 18" is a Mobile service station located on Route 22, Wassaic, New York. Defendants, or their subsidiaries or affiliates, were the owners and operators of the USTs located at Facility 18 at all times relevant to the allegations herein.

95.     From November 15, 2013, to March 13, 2014, Defendants failed to maintain insurance coverage sufficient to take corrective action and to compensate third parties for bodily injury and property damage caused by accidental releases arising from the operation of the USTs located at Facility 18, in violation of RCRA's financial responsibility provisions.

**Facility 19**

96.     "Facility 19" is a Shell service station located at 340 Violet Ave, Poughkeepsie, New York.  Defendants, or their subsidiaries or affiliates, were the owners and operators of the USTs located at Facility 19 at all times relevant to the allegations herein.

97.     From July 27, 2011, to March 13, 2014, Defendants failed to maintain insurance coverage sufficient to take corrective action and to compensate third parties for bodily injury and property damage caused by accidental releases arising from the operation of the USTs located at Facility 19, in violation of RCRA's financial responsibility provisions.

**Facility 20**

98.     "Facility 20" is Mobil service station located at 381 Knollwood Road, Greenburgh, New York.  Defendants, or their subsidiaries or affiliates, were the owners and operators of the USTs located at Facility 20 at all times relevant to the allegations herein.

99.     From January 13, 2011, to March 13, 2014, Defendants failed to maintain insurance coverage sufficient to take corrective action and to compensate third parties for bodily injury and property damage caused by accidental releases arising from the operation of the USTs located at Facility 20, in violation of RCRA's financial responsibility provisions.

## FIRST CLAIM FOR RELIEF

**Failure to Maintain Release Detection Records for USTs (Tanks and/or Pressurized Piping)**
**42 U.S.C. § 6991b(c)(2); 40 C.F.R. §§ 280.34(b) and (c), 280.45(b)**

100.    Owners and operators of USTs are required to maintain records reflecting their recent compliance with release detection requirements, 40 C.F.R. § 280.34(b), and have such records available for inspection by EPA upon request, 40 C.F.R. § 280.34(c).  Such records must be maintained for at least one year.  40 C.F.R. § 280.45(b).

101.     Defendants violated 40 C.F.R. §§ 280.34(b), 280.34(c), and 280.45(b) by failing to maintain release detection records for USTs located at Facilities 2, 3, 6, 8, 9, 10, 11, and 14, as detailed above.

102.     Pursuant to Section 9006(a)(1) of RCRA, 42 U.S.C. § 6991e(a)(1), the Court should issue an order enjoining Defendants to comply with the relevant statutory and regulatory requirements concerning maintenance of release detection records, and to perform any necessary remedial actions that may be necessary in light of their violations.   Additionally, pursuant to Section 9006(d)(2) of RCRA, 42 U.S.C. § 6991e(d)(2), and 40 C.F.R. § 19.4, the Court should enter civil penalties against Defendants in an amount not to exceed $16,000 per tank for each day of the violations identified above.

## SECOND CLAIM FOR RELIEF

**Failure to Perform Release Detection Monitoring for USTs**
**(Tanks and/or Pressurized Piping)**
**42 U.S.C. § 6991b(c)(1); 40 C.F.R. §§ 280.41(a), 280.41(b)(1)**

103.     Owners and operators of USTs containing petroleum must monitor such USTs at least every 30 days using one of the methods described in 40 C.F.R. § 280.43(d)-(h).   40 C.F.R. § 280.41(a).   Similarly, owners and operators must monitor the pressurized piping associated with their UST systems.   40 C.F.R. § 280.41(b)(1).

104.     Defendants violated 40 C.F.R. § 280.41(a) by failing to perform release detection monitoring for USTs located at Facilities 2 and 4, as detailed above.

105.     Pursuant to Section 9006(a)(1) of RCRA, 42 U.S.C. § 6991e(a)(1), the Court should issue an order enjoining Defendants to comply with the relevant statutory and regulatory requirements concerning release detection monitoring, and to perform any necessary remedial actions that may be necessary in light of their violations.   Additionally, pursuant to Section

9006(d)(2) of RCRA, 42 U.S.C. § 6991e(d)(2), and 40 C.F.R. § 19.4, the Court should enter civil penalties against Defendants in an amount not to exceed $16,000 per tank for each day of the violations identified above.

### THIRD CLAIM FOR RELIEF

**Failure to Perform Release Detection Monitoring for Temporarily Closed USTs
(42 U.S.C. § 6991b(c)(1); 40 C.F.R. 280.70(a))**

106.    Owners and operators of USTs that are temporarily closed for three months or more must continue to perform release detection monitoring if the temporarily closed USTs contain more than one inch of liquid residue.  40 C.F.R. § 280.70(a).

107.    Defendants Chestnut and CPD NY violated 40 C.F.R. § 280.70(a) by failing to perform release detection monitoring for temporarily closed USTs at Facilities 1, 5, 12 and 13 as detailed above.

108.    Pursuant to Section 9006(a)(1) of RCRA, 42 U.S.C. § 6991e(a)(1), the Court should issue an order enjoining Defendants to comply with the relevant statutory and regulatory requirements concerning release detection monitoring, and to perform any necessary remedial actions that may be necessary in light of their violations.  Additionally, pursuant to Section 9006(d)(2) of RCRA, 42 U.S.C. § 6991e(d)(2), and 40 C.F.R. § 19.4, the Court should enter civil penalties against Defendants in an amount not to exceed $16,000 per tank for each day of the violations identified above.

## FOURTH CLAIM FOR RELIEF

**Failure to Cap and Secure Temporarily Closed USTs**
**(42 U.S.C. § 6991b(c)(5); 40 C.F.R. § 280.70(b)(2))**

109.    Owners and operators of USTs that are temporarily closed for more than three months must cap and secure all lines, pumps, manways, and ancillary equipment associated with such USTs.  40 C.F.R. § 280.70(b)(2).

110.    Defendants violated 40 C.F.R. § 280.70(b)(2) by failing to cap and secure lines, pumps, manways, and ancillary equipment associated with USTs located at Facilities 5 and 9, as detailed above.

111.    Pursuant to Section 9006(a)(1) of RCRA, 42 U.S.C. § 6991e(a)(1), the Court should issue an order enjoining Defendants to comply with the relevant statutory and regulatory requirements concerning capping and securing temporarily closed USTs, and to perform any necessary remedial actions that may be necessary in light of their violations.  Additionally, pursuant to Section 9006(d)(2) of RCRA, 42 U.S.C. § 6991e(d)(2), and 40 C.F.R. § 19.4, the Court should enter civil penalties against Defendants in an amount not to exceed $16,000 per tank for each day of the violations identified above.

## FIFTH CLAIM FOR RELIEF

**Failure to Report Suspected Releases or Unusual Operating Conditions**
**(42 U.S.C. § 6991b(c)(3); 40 C.F.R. § 280.50)**

112.    Owners and operators of USTs must report suspected releases or unusual operating conditions to the implementing agency (New York State in this instance) within twenty-four hours of learning of such suspected releases or unusual operating conditions.  40 C.F.R. § 280.50.  This includes, among other things, reporting liquid in the interstitial space of a UST system, *see* 40

C.F.R. § 280.50(b), and reporting the results of an investigation into an alarm triggered by a release detection monitoring system, *see* 40 C.F.R. § 280.50(c).

113.    Defendants violated 40 C.F.R. § 280.50 by failing to report a suspected release and unusual operating conditions for USTs located at Facilities 4 and 7, as detailed above.

114.    Pursuant to Section 9006(a)(1) of RCRA, 42 U.S.C. § 6991e(a)(1), the Court should issue an order enjoining Defendants to comply with the relevant statutory and regulatory requirements concerning reporting of suspected releases and unusual operating conditions, and to perform any necessary remedial actions that may be necessary in light of their violations. Additionally, pursuant to Section 9006(d)(2) of RCRA, 42 U.S.C. § 6991e(d)(2), and 40 C.F.R. § 19.4, the Court should enter civil penalties against Defendants in an amount not to exceed $16,000 per tank for each day of the violations identified above.

## SIXTH CLAIM FOR RELIEF

### Failure to Investigate Suspected Releases
### (42 U.S.C. § 6991b(c)(3); 40 C.F.R. § 280.52)

115.    Owners and operators of USTs must immediately investigate and confirm suspected releases within seven days of learning of such suspected releases or unusual operating conditions.  40 C.F.R. § 280.52.

116.    Defendants violated 40 C.F.R. § 280.52 by failing to investigate and confirm a suspected release and unusual operating conditions for USTs located at Facilities 4 and 7, as detailed above.

117.    Pursuant to Section 9006(a)(1) of RCRA, 42 U.S.C. § 6991e(a)(1), the Court should issue an order enjoining Defendants to comply with the relevant statutory and regulatory requirements concerning investigation and confirmation of suspected releases and to perform any necessary remedial actions that may be necessary in light of their violations.  Additionally,

pursuant to Section 9006(d)(2) of RCRA, 42 U.S.C. § 6991e(d)(2), and 40 C.F.R. § 19.4, the Court should enter civil penalties against Defendants in an amount not to exceed $16,000 per tank for each day of the violations identified above.

## SEVENTH CLAIM FOR RELIEF

### Failure to Operate (including Inspecting and Testing) and Maintain Records of Corrosion Protection (42 U.S.C. § 6991b(c)(2); 40 C.F.R. §§ 280.31(d), 280.70(a))

118.    Owners and operators of USTs that are temporarily closed for three months or more must continue operation of their corrosion protection systems.  40 C.F.R. § 280.70(a).  Moreover, owners and operators must maintain records of corrosion protection testing.  40 C.F.R. § 280.31(d).

119.    Defendants violated 40 C.F.R. §§ 280.31(d) and 280.70(a) by failing to operate (including inspect and test) and maintain corrosion protection and maintain corrosion protection records for USTs located at Facility 5, as detailed above.

120.    Pursuant to Section 9006(a)(1) of RCRA, 42 U.S.C. § 6991e(a)(1), the Court should issue an order enjoining Defendants to comply with the relevant statutory and regulatory requirements concerning maintenance of records regarding corrosion protection testing, and to perform any necessary remedial actions that may be necessary in light of their violations. Additionally, pursuant to Section 9006(d)(2) of RCRA, 42 U.S.C. § 6991e(d)(2), and 40 C.F.R. § 19.4, the Court should enter civil penalties against Defendants in an amount not to exceed $16,000 per tank for each day of the violations identified above.

## EIGHTH CLAIM FOR RELIEF

### Failure to Meet Financial Responsibility Requirements (42 U.S.C. § 6991b(c)(6); 40 C.F.R. § 280.93)

121.    Owners and operators of USTs are required to demonstrate financial responsibility by maintaining insurance sufficient to take corrective action and compensate third parties for

bodily injury and property damage caused by accidental releases arising from USTs they own or operate.  40 C.F.R. § 280.93(a), (b).

122.    EPA's review of records, including Defendants' responses to EPA's information request letters, establishes that Defendants failed to meet their financial responsibility requirements for Facilities 15, 16, 17, 18, 19, and 20.  Specifically, at various times between January 13, 2011, and the present, Defendants have failed to possess the required insurance coverage for the USTs located at these Facilities, as detailed above.

123.    Pursuant to Section 9006(a)(1) of RCRA, 42 U.S.C. § 6991e(a)(1), the Court should issue an order enjoining all Defendants to comply with the relevant statutory and regulatory requirements concerning financial responsibility.  Additionally, pursuant to Section 9006(d)(2) of RCRA, 42 U.S.C. § 6991e(d)(2), and 40 C.F.R. § 19.4, the Court should enter civil penalties against all Defendants in an amount not to exceed $16,000 per tank for each day of the violations identified above.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court:

i.    Enter judgment against Defendants and in favor of the United States for the violations alleged in this Complaint;

ii.    Enter a permanent injunction compelling Defendants to comply with Subtitle I of RCRA and its related regulations, and requiring Defendants to mitigate prior violations;

iii.    Enter an order imposing civil penalties against Defendants for the violations alleged in this Complaint for the periods of violations; and

iv.    Grant such other and further relief as the Court deems just and appropriate.

Dated: New York, New York
    May 1, 2019

         Respectfully submitted,

         GEOFFREY S. BERMAN
         United States Attorney for the
         Southern District of New York

    By:

         CHRISTOPHER CONNOLLY
         JENNIFER C. SIMON
         Assistant United States Attorneys
         86 Chambers Street, 3rd Floor
         New York, New York 10007
         Tel.: (212) 637-2761/2746
         E-mail: christopher.connolly@usdoj.gov
            jennifer.simon@usdoj.gov


         ELLEN M. MAHAN
         Deputy Chief
         Environmental Enforcement Section
         Environment & Natural Resources Division
         U.S. Department of Justice


Of Counsel:
Bruce H. Aber
Assistant Regional Counsel,
U.S. Environmental Protection Agency, Region 2

- 30 -